**Electronically FILED by
Superior Court of California,
County of Los Angeles
2/03/2026 8:15 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By P. Rodriguez, Deputy Clerk**

**SAMINI BLOCK APC**
Bobby Samini (SBN 181796)
bobby.samini@saminilaw.com
650 Town Center Drive, Suite 1500
Costa Mesa, California 92626
Telephone: (949) 724-0900

Attorneys For Plaintiff
FLOYD J. MAYWEATHER

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

| | |
|---|---|
| FLOYD J. MAYWEATHER, an individual, | Case No.: 26STCV03610 |
| Plaintiff, | |
| vs. | **COMPLAINT FOR DAMAGES** |
| SHOWTIME NETWORKS INC., a Delaware corporation; STEPHEN ESPINOZA, an individual; and DOES 1–100, inclusive, | |
| Defendants. | |

## **INTRODUCTION**

1. This action seeks to recover hundreds of millions of dollars in misappropriated funds and damages resulting from a long-running and elaborate scheme of financial fraud, breaches of fiduciary duty, and conspiracy orchestrated by Floyd J. Mayweather's ("Plaintiff" or "Mayweather") former manager and advisor, Al Haymon ("Haymon"), with the knowing and substantial participation and aid of Defendants Showtime Networks Inc. ("Showtime") and Stephen Espinoza ("Espinoza"), among others. Mayweather, a legendary professional boxer, was systematically deprived of a significant portion of his career earnings—at least $340 million (and potentially far more when accounting for lost investment growth)—through a complex web of hidden accounts, unauthorized transactions, and deliberate concealment of financial records.

2. Defendants Showtime and Espinoza (then President of Showtime Sports) played a critical role in facilitating this misconduct. It is alleged that they diverted funds intended for Mayweather into accounts controlled by Haymon (or his agents), claimed that critical financial records for Mayweather's biggest fights were "lost" or inaccessible, and failed to provide transparency despite clear contractual obligations and repeated requests for accounting. By wiring fight proceeds to accounts not directly accessible by Mayweather (such as an account at First Security Bank of Nevada held by counsel retained by Haymon), and by later asserting defenses like the statute of limitations while key documents were missing, Showtime and Espinoza enabled Haymon's scheme and stymied Mayweather's efforts to uncover the truth.

3. As a result of this scheme, Mayweather has suffered enormous financial harm. From his reported $1.2 billion in career purses, at least $340 million is "missing" and unaccounted for. Conservative investment of those funds would likely have made that sum worth several billion today. In addition, Mayweather alleges that Showtime still owes him $20 million from the 2015 Berto fight (a payout that was supposed to come from the proceeds of the Pacquiao fight). Mayweather brings this action to hold Showtime and Espinoza accountable for aiding and abetting Haymon's breaches of duty, for participating in a conspiracy to defraud him, and for the direct wrongs of conversion and unjust enrichment. He seeks not only the return of his

1  misappropriated funds, but also punitive damages to punish Defendants' willful and malicious

2  conduct and to deter similar misconduct in the future.

3  **THE PARTIES**

4      4.    Plaintiff Floyd Mayweather, Jr., is an individual residing in Nevada and a world-

5  renowned African American professional boxer. He is the principal of Mayweather Promotions,

6  LLC. Throughout his career, Mayweather entrusted the management of his financial and business

7  affairs to a close advisor (Haymon), giving rise to a fiduciary relationship.

8      5.    Defendant Showtime Networks Inc. is a television network and mass media

9  company. Showtime partnered with Mayweather for numerous major pay-per-view boxing events,

10  including record-breaking bouts such as Mayweather vs. Pacquiao (2015) and Mayweather vs.

11  McGregor (2017). Showtime was responsible for distributing pay-per-view revenues and other

12  fight proceeds pursuant to distribution agreements, and had duties to maintain and provide

13  accurate accounting of event finances.

14      6.    Defendant Stephen Espinoza is an individual who served as President of Showtime

15  Sports during the period of the events in question. In that role, Espinoza oversaw Showtime's

16  boxing programming and business dealings, including those involving Mayweather's fights.

17  Espinoza departed Showtime amid its corporate restructuring in or around 2023, and has since

18  reportedly joined Al Haymon in his boxing enterprise, illustrating a continued relationship with

19  Mayweather's fiduciary.

20      7.    Non-Party Al Haymon was Mayweather's long-time manager/advisor and the

21  alleged mastermind of the financial scheme. A Harvard-educated businessman with a background

22  in the music promotion industry, Haymon is known for operating behind the scenes and

23  maintaining extreme secrecy in his dealings. Mayweather considered Haymon a father figure and

24  relied on him to manage virtually all aspects of his finances and contracts. This position of trust

25  and confidence made Haymon a fiduciary to Mayweather under California law. Haymon,

26  however, has a reputation for leaving "surprisingly few fingerprints" on transactions and

27  disclosing as little as possible even to those he works with.

28

8.      Non-Party Jeff Morris is a certified public accountant and tax attorney who was engaged (allegedly by Haymon, without Mayweather's informed consent) to handle Mayweather's tax and accounting matters. Morris is a signatory or controller on several bank accounts where Mayweather's fight earnings were deposited. For example, an account at First Security Bank of Nevada in the name of "Jeffrey Morris Associates" (or similar) was designated to receive revenue from at least one Mayweather fight. Morris's role in the scheme includes facilitating transfers and concealing information at Haymon's direction.

9.      MGM Grand (the Las Vegas venue for many of Mayweather's fights) and HBO (the network that televised many of Mayweather's early career bouts) are also involved in the background of this case. The MGM Grand was party to certain revenue distribution arrangements (e.g., live gate, concessions for fights), and HBO was Mayweather's broadcast partner before Showtime. While not defendants here, their contracts and payments are part of the factual narrative.

10.     Mayweather is informed and believes that other as-yet unidentified persons or entities (designated as DOES) also participated in or facilitated the wrongful conduct alleged herein. This may include individuals within Showtime/Paramount who handled accounting, or others in Haymon's camp who managed funds. Mayweather will seek leave to amend this Complaint to assert claims against such persons when their identities and roles are fully ascertained.

## JURISDICTION AND VENUE

11.     Plaintiff Floyd Mayweather is an individual residing in Nevada.

12.     Defendant Espinoza is an individual residing in California

13.     Defendant Showtime is a New York corporation which has business operations in California.

## FACTUAL BACKGROUND

## I.     MAYWEATHER'S EARLY CAREER AND TRUST IN HAYMON

14.     Mayweather was born into humble circumstances and grew up in poverty in Grand Rapids, Michigan. By age 19, he had launched his professional boxing career. Lacking

sophisticated business guidance at that young age, Mayweather signed his first promotional contracts (including a long-term deal with Top Rank Boxing and HBO) without independent legal counsel present. For instance, he later learned that an early contract gave HBO control over his fight footage "masters," a term he did not fully understand at the time, and which would have future financial implications. Despite these disadvantages, Mayweather's talent propelled him quickly to championship status, earning him the nickname "Pretty Boy Floyd" and later "Money Mayweather."

15.     In or around 2004, Mayweather was introduced to Al Haymon. The introduction was facilitated by Sam Watson (a mutual acquaintance known to be Haymon's close associate and liaison in boxing circles). Haymon, a Harvard MBA graduate and former music concert promoter, impressed Mayweather with his vision for maximizing fighters' earnings and taking a more fighter-centric approach than traditional boxing promoters. Mayweather, coming off strained relationships with promoters (he famously bought out his contract with Bob Arum/Top Rank to become a free agent), was receptive to Haymon's advice and influence.

16.     Mayweather and Haymon entered into what Mayweather understood to be a verbal one-year management/advisory agreement around 2005. Under this oral arrangement, Haymon would act as Mayweather's manager/adviser for a 10% fee (meaning Haymon would receive 10% of Mayweather's fight earnings, and Mayweather would keep 90%). This split was notably favorable compared to the standard manager fee (often 33% in boxing). Mayweather has credited this unconventional deal structure with revolutionizing boxer-management relationships, stating that it "changed boxing management forever" by empowering the fighter. After the one-year term lapsed, no new written agreement was signed, yet Haymon continued in the same role for the next 15+ years. Haymon at times represented (to Mayweather and others) that he "never took a dollar from Floyd" beyond perhaps token amounts, even claiming he provided his services out of loyalty or friendship. (For example, Haymon would later say he "did everything for free" for Mayweather, which Mayweather now believes was a deceptive narrative.)

17.     Over the years, Haymon became deeply embedded in every aspect of Mayweather's professional and personal affairs. Mayweather trusted Haymon implicitly—

viewing him as a father figure and referring to him as "The Godfather" of his team. Haymon handled contract negotiations, television deals, sponsorships, and even personal expenditures and investments on Mayweather's behalf. Because Mayweather's focus was on training and boxing, he relied on Haymon's judgment in business matters. This reliance and reposal of trust created a fiduciary duty on Haymon's part to act with the utmost loyalty, good faith, and candor towards Mayweather. Under California law, such a duty arises when one person is in a position of trust and confidence and exercises dominance or influence over the other. Mayweather's relationship with Haymon squarely fits that definition: Haymon was obligated to act in Mayweather's best interests, to fully disclose material facts about Mayweather's finances, and to refrain from self-dealing or profiting at Mayweather's expense.

18.     Significantly, despite handling vast sums of Mayweather's money over many years, Haymon never instituted transparent reporting or independent oversight. No formal accounting statements were provided to Mayweather. Financial records were tightly controlled by Haymon and his chosen confidants (like Jeff Morris). When questions arose, Haymon often provided reassurances without documentation, and Mayweather, given his trust, often accepted those explanations. This lack of oversight set the stage for the concealed scheme described below. Indeed, California law recognizes that when a fiduciary fails to disclose their own breaches, such omission can constitute constructive fraud tolling any statute of limitations. Here, Haymon's omissions and obfuscations prevented Mayweather from discovering the truth for a long time.

## II.     HAYMON'S FINANCIAL SCHEMES AND BREACHES OF FIDUCIARY DUTY

19.     Over approximately two decades of managing Mayweather, Haymon engaged in a pattern of financial manipulation and self-dealing behind Mayweather's back. These schemes included, *inter alia*: (a) diverting portions of Mayweather's fight earnings under false pretenses that Haymon then kept or controlled; (b) routing fight revenues into secret accounts that Mayweather did not know about or have access to; (c) paying himself and his associates large sums from Mayweather's funds without authorization; and (d) concealing or altering documentation to cover up these activities. Haymon's conduct, as alleged, was a blatant breach of

his fiduciary duties of loyalty, candor, and care owed to Mayweather. Each aspect of the scheme is detailed below.

20.    Banking records (obtained recently by Mayweather's team) show a pattern of large transfers from the above accounts to Alan Haymon Development, Inc. and other Haymon-owned entities. These transfers were often labeled as "repayment" or "loan payoff," falsely suggesting that Haymon had advanced money to Mayweather at some earlier time which was now being reimbursed. Mayweather insists he never received such loans from Haymon. The effect was to systematically move Mayweather's earnings into Haymon's coffers under false pretenses. For example, over the course of years, tens of millions would be moved to "Alan Haymon Development" shortly after major fights, draining the account that held Mayweather's money.

21.    Additionally, records show numerous one-off payments from Mayweather's accounts directly to Haymon or Morris. These include transactions on dates unconnected to any fight, with memos like "Mayweather expenses" or no clear description, in amounts such as $12 million, $15 million, $3 million, $9 million, etc. Each of these represents Mayweather's money being paid out without his authorization or benefit. Mayweather never approved paying Haymon such bonuses or fees beyond the agreed 10%, and certainly not paying his accountant Morris multimillion-dollar sums. Such payments, if they occurred, were clear misappropriations.

22.    Haymon took great pains to ensure Mayweather remained unaware of these accounts and transactions. This is corroborated by statements from insiders that Haymon only permitted Floyd to see what Haymon wanted him to see, and actively hid documentation. In one communication, Haymon directed Morris to send Floyd only the signature pages of contracts or forms—with Haymon's handwritten notes—and explicitly said "he doesn't want Floyd to see the documents." This level of control prevented Mayweather from discovering the outflows of his money. It was a direct breach of Haymon's fiduciary duty to provide full disclosure of material facts related to Mayweather's finances.

23.    Haymon's aversion to leaving a digital trail extended to how he communicated instructions. He often relied on fax transmissions and in-person meetings rather than emails. In fact, when a subpoena for Haymon's deposition was served in related litigation, his counsel

1    represented that "Mr. Haymon does not own or operate a computer," underscoring Haymon's

2    deliberate avoidance of traceable electronic communication. By using faxes and avoiding email,

3    Haymon made it harder to later uncover written evidence of his directives (for example,

4    instructions to banks or accountants). This "old school" approach was part of what one associate

5    called working in the "Flintstone ages," and it served the purpose of secrecy well.

6          24.    On at least one occasion, Haymon or his agents allegedly altered a document to

7    conceal wrongdoing. Mayweather's representatives have an example of a faxed authorization

8    form in which the date appears to have been manually altered (whited-out and rewritten) to

9    misrepresent when it was signed. That same document, which purported to authorize Jeff Morris

10   to pay himself a large sum from Mayweather's account, had a telling notation initially—"We need

11   to cover our ass"—which was crossed out in the version sent to the bank. The presence of that

12   phrase (and its redaction) strongly suggests that Haymon and his team recognized the impropriety

13   of what they were doing and were attempting to paper over the trail. Moreover, following

14   Haymon's suffering a medical issue (a stroke) in late 2023, there was a sudden exodus of key

15   members of Mayweather's camp: five of Mayweather's long-time lawyers abruptly "retired" or

16   withdrew from representation within a three-month span. This timing raised suspicion that those

17   individuals may have been aware of or complicit in aspects of the hidden scheme, and chose to

18   distance themselves once Haymon was incapacitated and the situation risked exposure. To date,

19   many records remain missing. Indeed, when Mayweather's new team asked Showtime in 2024 for

20   documentation of fight revenues and expenses, they were told that some records (for example, the

21   payout spreadsheets or deal memos for the Pacquiao and McGregor fights) were "lost in a flood"

22   or stored off-site and not readily accessible. Whether or not such a flood occurred, the end result

23   is that documentation that would clearly trace the flow of money to and from Mayweather for his

24   biggest fights is conveniently unavailable.

25   III.   **SHOWTIME AND ESPINOZA'S KNOWING PARTICIPATION & CRITICAL**

26          **COMPLICITY**

27          25.    Starting in 2013, Mayweather entered an exclusive multi-fight deal with

28   Showtime, leaving HBO. This deal (the richest in boxing at the time) made Showtime the

1   broadcaster of Mayweather's fights and a key financial intermediary. Under the Showtime

2   contract and subsequent event agreements, Showtime was responsible for collecting pay-per-view

3   revenues and other fight income, deducting certain agreed expenses, and then disbursing the

4   proceeds (purses, bonuses, etc.) to Mayweather or his designated entity (Mayweather

5   Promotions). Stephen Espinoza, as head of Showtime Sports, personally negotiated with

6   Mayweather's team and oversaw these events. The Mayweather-Pacquiao fight in May 2015, for

7   example, was a Showtime/Viacom and HBO co-production, with a detailed distribution

8   agreement governing who got paid what. Similarly, Mayweather-McGregor in 2017 was handled

9   by Showtime. Thus, Showtime/Espinoza were in a position to know exactly how much money

10  was generated and where it was directed.

11          26.      Instead of paying Mayweather directly or into an account under Mayweather's sole

12  control, Showtime (at the direction or request of Haymon/Ellerbe at the time) wired

13  Mayweather's share of fight proceeds to the First Security Bank account of Mayweather's "tax

14  counsel" (Jeff Morris). For instance, in the Pacquiao fight, the distribution agreement designated

15  that Mayweather's purse and upside would be paid to an account at First Security Bank of

16  Nevada in the name of Jeff Morris (with Morris as signatory). Showtime complied with that

17  direction. By doing so, Showtime effectively delivered Mayweather's money straight into

18  Haymon's hands, since Haymon controlled Jeff Morris's actions. Given the size of the transfers

19  (hundreds of millions) and the unusual nature of paying a fighter via a third-party lawyer's trust

20  account, this should have raised red flags within Showtime. On information and belief, Stephen

21  Espinoza and other Showtime executives were aware that Al Haymon was the de facto controller

22  behind those accounts—indeed, Espinoza publicly acknowledged that Haymon often stayed in the

23  background and let others (like lawyers or promoters) formally handle business, a pattern dating

24  back to Haymon's concert business days. Thus, Defendants knew that by sending funds to Jeff

25  Morris's account, they were knowingly participating in a structure that kept Mayweather from

26  directly receiving or overseeing his own earnings.

27          27.      As Mayweather's distribution partner, Showtime had contractual duties to provide

28  an accounting of event revenues and expenses. However, when Mayweather's new management

team (led by Richard Schaefer) in late 2024 requested detailed breakdowns for the Pacquiao and McGregor fights, Showtime was unable or unwilling to produce them. In correspondence (emails in November 2024) to Showtime/Paramount finance personnel (including Kane Milverton and Elze Fogarty), Schaefer itemized serious discrepancies: for example, expense reimbursements charged against the Pacquiao fight totaling millions of dollars that appeared inflated or unsupported, and a mysterious $20 million "reimbursement" for the Andre Berto fight that was paid out of the Pacquiao fight funds. These inquiries implied that someone had used the huge Pacquiao revenue pool as a slush fund to pay unrelated costs (like the Berto payout) or excessive "expenses" that benefited Haymon's operation (possibly including large fees to Haymon or his companies). Rather than provide transparency, Showtime's response was that many records were not readily available. Haymon claimed that certain documents were "lost due to a flood" in a storage facility while Showtime claimed that the records had been moved off-site when Showtime Sports was downsized. Whether or not this was true, the effect was to stonewall Mayweather's attempts to follow the money trail. By failing to maintain and produce the records, Showtime breached the very purpose of its involvement—to fairly handle and report money owed to the fighter.

28.     Mayweather's representatives made numerous requests, both verbally and by email, seeking to obtain the records. Notwithstanding Showtime's claims that they were located in an off-site storage facility and would be retrieved, the records were never provided to Mayweather.

29.     After Showtime exited the boxing business in 2023, Stephen Espinoza quickly aligned himself with Haymon's Premier Boxing Champions (PBC) venture. In December 2023, reports emerged (via boxing insider Rick Glaser) that Espinoza had been hired by Al Haymon to help run PBC's new broadcasting deal with Amazon Prime. In other words, Espinoza went from ostensibly representing the interests of a broadcast partner (Showtime) to being on Haymon's payroll. This move casts a retrospective light on Espinoza's actions during the Showtime years: it suggests that Espinoza may have had a motivation to keep Haymon (a powerful supplier of content and now his future boss) happy, even if it meant turning a blind eye to irregularities.

Indeed, public comments by Espinoza have consistently defended Haymon. For example, in a Washington Post interview, Espinoza downplayed Haymon's secrecy, stating Haymon "doesn't need to be seen" and that he stayed in the background even in the music business. Espinoza's familiarity with Haymon's methods supports an inference that Espinoza *knew* Haymon was likely doing things unconventionally (if not improperly) with Mayweather's money, yet Espinoza did nothing to alert Mayweather or intervene.

30.    Showtime and Espinoza were aware that Haymon was acting as Mayweather's manager/advisor (a fiduciary role). They also were aware, or certainly should have been, that Haymon was not reporting or behaving like a typical manager who simply takes a percentage. The extraordinarily large sums moving at Haymon's direction (far beyond a 10% fee), and the unusual account structures, indicated that Haymon was breaching his duties to Mayweather. Under California law, a third party who knowingly participates in another's breach of fiduciary duty can be held liable for aiding and abetting that breach. Here, Showtime and Espinoza's actions—funneling money to Haymon-controlled accounts, failing to provide information, and perhaps even concealing the truth—amounted to substantial assistance to Haymon's scheme. They provided the means and cover for Haymon to succeed in defrauding Mayweather.

31.    After receiving Schaefer's 2024 inquiries, Showtime involved its legal department. Instead of a cooperative stance, Showtime raised the specter of the statute of limitations, suggesting that any claims related to fights as far back as 2015 might be time-barred. This position is deeply ironic because the only reason Mayweather did not discover the issues sooner was the elaborate concealment—missing records, falsified statements, trust in his fiduciary, etc. California law tolls the statute of limitations in cases of fraudulent concealment or where the plaintiff is unaware of the facts due to the defendant's wrongful acts. By attempting to hide behind time limits while having contributed to the delay in discovery, Showtime essentially confirmed its complicity. Mayweather asserts that any limitations period is tolled by the Defendants' concealment and that he has filed promptly upon discovering the scheme.

32.    In sum, Showtime and Espinoza enabled and assisted Haymon's breach of duty in multiple ways: (a) Facilitating control of funds: by paying Mayweather's earnings into accounts

Haymon controlled, rather than ensuring Mayweather's direct receipt; (b) Lack of transparency: by failing to provide Mayweather with timely and accurate financial information and by "losing" or not keeping track of key documents, they made it possible for the fraud to go undetected; (c) Silence despite knowledge: Espinoza and others at Showtime who had detailed knowledge of the fight finances did not speak up to Mayweather even when things looked irregular (for instance, they never queried Mayweather, "Did you authorize these inflated marketing expenses?" or "Should this $20 million for Berto really come out of your share?"); and (d) Post-hoc obstruction: when confronted, they offered excuses and legal defenses instead of full cooperation. Such conduct by a business partner is actionable and has directly harmed Mayweather.

## IV.   DAMAGES AND ONGOING IMPACT

33.    The financial harm to Mayweather is massive. As noted, at least $340 million of his earnings have been misappropriated or remain unaccounted for. This is money Mayweather earned through blood, sweat, and tears in the ring—including the historically lucrative Pacquiao fight (which alone should have netted him roughly $240 million) and others. Beyond the principal sum, the lost investment potential is enormous: Even a conservative index fund might double money every 7–10 years, so that $340 million could easily have grown to over a billion in a decade. Mayweather's ability to generate such income again (through fighting) is limited, as he is now semi-retired and 48 years old. Thus, the opportunity cost is irretrievable, warranting a significant award of *prejudgment interest* and/or *loss of use* damages on top of the raw amount.

34.    Mayweather built a public persona around financial success ("The Money Team"). The revelation that he was defrauded out of hundreds of millions—and the resultant (false) rumors that he was "broke" or stuck overseas due to money issues—have caused him reputational harm and mental anguish. He has had to endure public speculation about his finances that is mortifying for someone of his pride and status. Internally, discovering this betrayal by a long-trusted advisor (Haymon) has been emotionally devastating. It has strained relationships within his camp and family, and caused him to question his own judgment in trusting people. These are real damages cognizable under fraud and fiduciary breach claims.

35.     The conduct of Defendants, as alleged, was willful, malicious, and fraudulent. Showtime and Espinoza acted in conscious disregard of Mayweather's rights by abetting Haymon's scheme or, at least, remaining deliberately indifferent to the obvious irregularities. California law allows punitive damages in tort actions where the defendant has been guilty of oppression, fraud, or malice (express or implied). Here, the allegations, if proven, establish fraud and malice. Putting profits and business relationships above the duty to be honest with Mayweather is despicable conduct. The amount involved (hundreds of millions) also calls for a substantial punitive award to deter similar conduct in the sports and entertainment industry, where powerful managers or networks might otherwise be tempted to exploit superstar talent.

36.     In addition to money damages, Mayweather seeks injunctive relief in the form of a full forensic accounting and constructive trust. He asks that the Court order Defendants to provide a complete accounting of all revenues and expenses for his fights under Showtime, and all communications with Haymon or his entities regarding distributions. A constructive trust should be imposed on any such funds or any assets purchased with the misappropriated money, to ensure they can be recovered for Mayweather's benefit.

37.     Mayweather has incurred and will continue to incur significant costs to unravel this scheme. This includes hiring forensic accountants, attorneys, and investigators. These costs are recoverable as damages or as equitable relief (surcharge against fiduciary, etc.), because they are the natural and proximate result of Defendants' wrongdoing—had Defendants been truthful and transparent, Mayweather would not have to spend money to find his own money.

38.     Mayweather entrusted his life's earnings to those he believed were acting in his best interest. Instead, through a combination of betrayal and complicity, he was left with a fraction of what he earned. The law must now make him whole, and hold those responsible to account.

**FIRST CAUSE OF ACTION**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
*(Against Showtime and Stephen Espinoza)*

39.     Plaintiff realleges each the foregoing paragraphs as if full set forth herein.

40.     Mayweather and Haymon had a longstanding relationship of trust wherein Haymon served as Mayweather's manager, advisor, and de facto business agent. Under California law, a fiduciary relationship exists when one person is under a duty to act for the benefit of another in matters within the scope of their relationship, with loyalty, trust, and confidence. Here, Haymon owed Mayweather fiduciary duties of loyalty, utmost good faith, candor, and care. He was required to put Mayweather's interests above his own, to refrain from self-dealing, and to disclose material financial information to Mayweather.

41.     Haymon breached his fiduciary duties in numerous ways, including but not limited to:

a.   **Misappropriating Funds**: Diverting Mayweather's earnings into accounts Haymon controlled and then using those funds for Haymon's own benefit (e.g., transferring tens of millions to his companies, taking unauthorized "fees" far above the agreed 10%, and paying personal or unrelated expenses with Mayweather's money).

b.   **Self-Dealing and Conflicts**: Positioning himself on both sides of transactions (for instance, as advisor to Mayweather but also as a purported creditor via "Alan Haymon Development, Inc.") and effecting transfers that benefited himself without Mayweather's consent.

c.   **Non-Disclosure and Concealment**: Failing to disclose to Mayweather the existence of bank accounts holding his money, the transfers out of those accounts, or the overall status of Mayweather's finances. Instead, Haymon gave false assurances and partial information, thereby deceiving Mayweather. The failure of a fiduciary to inform the beneficiary of breaches itself constitutes constructive fraud. Haymon actively concealed his wrongdoing, tolling any statutes of limitation that might otherwise apply.

d.   **Gross Mismanagement:** Even apart from outright theft, Haymon utterly failed to keep proper records, commingled funds, and did not act with the prudence expected of a fiduciary managing another's money. His use of fax and avoidance of normal accounting systems was a breach of the duty to maintain reasonable control and documentation of assets.

42.     As set forth above, Al Haymon breached his fiduciary duties to Mayweather through extensive misappropriation and deceit. Haymon's breach is the underlying wrongdoing in this aiding-and-abetting claim. The existence of the fiduciary relationship and its breach are established by the facts above (Haymon was in a position of trust and breached that trust by self-dealing, concealment, etc.).

43.     Defendants Showtime and Espinoza had actual or constructive knowledge that Haymon was engaging in conduct inconsistent with his fiduciary duties to Mayweather. They knew Haymon was Mayweather's fiduciary agent in control of his payments. They witnessed or facilitated unusual transactions (such as directing payments to accounts not in Mayweather's name, and the lack of direct payments to Mayweather). Espinoza, especially, as a seasoned attorney and sports executive, would recognize that a manager secretly taking far more than a 10% fee or routing money through opaque channels is breaching his duty. At minimum, Defendants were aware of facts that should have alerted them to the high probability of Haymon's breach (willful blindness is not a defense). For example, the sheer scale of "expense" deductions ($50+ million) and off-the-top payments for unrelated fights (the $20 million Berto reimbursement) cannot square with an honest fiduciary arrangement, and Defendants were aware of those financial moves.

44.     Defendants provided substantial assistance and encouragement to Haymon's breach of duty. Their aiding and abetting took multiple forms:

a.     **Financial Conduit:** Showtime acted as the conduit by which funds reached Haymon. By depositing Mayweather's earnings into the Jeff Morris/First Security Bank account (rather than insisting on paying Mayweather or an escrow under joint control), Showtime made it possible for Haymon to seize control of the money. Without Showtime's cooperation, Haymon would have had to convince Mayweather to hand over the funds; instead, Showtime's direct deposit into Haymon's sphere achieved that in one step.

b.     **Lack of Oversight or Objection:** Espinoza and Showtime executives did not object to or question instructions that, on their face, were irregular. For instance, if Haymon or a representative said "send the money to this account for Floyd," Showtime complied without

verifying with Mayweather personally. By treating Haymon's word as sufficient, they enabled Haymon's unchecked control. In contrast, had Showtime insisted on Mayweather's personal sign-off or had they flagged unusual requests, the scheme could have been stopped or exposed earlier.

c. **Concealment and Stonewalling:** When Mayweather's team began investigating, Showtime did not come clean. Instead, they gave excuses about missing records and time-barred claims. This helped Haymon by delaying discovery of the full scope of the breach. By not volunteering information or documents in their possession (like internal emails, drafts of agreements, audit rights, etc.), Showtime shielded Haymon. Even after Haymon was sidelined by health issues, Showtime did not take the opportunity to assist Mayweather; rather, they continued to resist transparency. This behavior in 2024 constitutes aiding and abetting as it furthered Haymon's goal of avoiding accountability.

d. **Benefit and Alignment:** Showtime benefited from its cozy relationship with Haymon (he delivered top boxing content) and Espinoza personally had an interest in keeping Haymon pleased (leading to his future employment). This alignment of interests led them to side with Haymon rather than Mayweather when conflicts arose. For example, if there was a dispute about whether certain expenses were legitimate, Showtime effectively sided with Haymon's accounting. By serving Haymon's interests, they substantially assisted him in maintaining the facade of propriety.

45.    Aiding and abetting breach of fiduciary duty requires: (1) a fiduciary relationship and breach by the primary wrongdoer; (2) the aider's knowledge of the breach; (3) substantial assistance or encouragement of the breach; and (4) damages resulting from the breach. Here: (1) Haymon's fiduciary breach is established; (2) Showtime/Espinoza knew or should have known, as detailed; (3) their acts and omissions were substantial assistance; and (4) Mayweather's damages ensued as a result (the money would not have been lost but for, inter alia, Showtime funneling it to Haymon and failing to report irregularities).

46.    The aiding-and-abetting defendants are jointly and severally liable for the damages caused by the breach. Thus, Showtime and Espinoza are liable for the full amount of damages that flowed from Haymon's breaches—the same $340+ million and consequential losses

described earlier—because their participation was a proximate cause of that loss. Had they not aided Haymon, the breach might have been prevented or mitigated.

47.     Aiding and abetting a fiduciary's fraud is itself an intentional tort warranting punitive damages if done with malice or fraud. Showtime and Espinoza's actions were carried out willfully and with conscious disregard of Mayweather's rights. They chose to prioritize business expediency and their alliance with Haymon over the duty to ensure Mayweather wasn't being robbed. This kind of corporate complicity in fraud merits punitive damages to punish and deter. Mayweather seeks punitive damages against Showtime and Espinoza in an amount appropriate to punish their conduct and deter others, subject to proof at trial and the enlightened conscience of the jury (but given the wealth of corporate Defendants, this should be a substantial sum).

## SECOND CAUSE OF ACTION
### CIVIL CONSPIRACY TO COMMIT FRAUD
*(Against Showtime and Stephen Espinoza)*

48.     Plaintiff realleges each the foregoing paragraphs as if full set forth herein.

49.     Defendants Showtime and Espinoza, together with Al Haymon (and possibly Jeff Morris and others), knowingly combined and agreed to accomplish an unlawful objective— namely, to defraud Mayweather and misappropriate his earnings. An actionable civil conspiracy consists of a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another, and which results in damage. Here, by at least 2015 if not earlier, there was a meeting of the minds between Haymon and Showtime's representatives that Haymon would control the disbursement of Mayweather's money and that Showtime would cooperate in that regard, even if it meant sidelining Mayweather's direct involvement. The shared goal was to allow Haymon to handle (and as it turned out, divert) funds in ways not contractually or legally authorized, which is an unlawful objective (it entails breach of fiduciary duty and fraud). While Haymon's motive was personal enrichment, Showtime/Espinoza's motive was to maintain their lucrative partnership with Haymon/Mayweather and later to ingratiate Espinoza with Haymon. This alignment produced an

implied agreement: Showtime would not interfere with or reveal Haymon's financial machinations, and Haymon would continue delivering fights and perhaps even cut Showtime/execs in on favorable terms (indeed Espinoza got a job).

50.    In furtherance of the conspiracy, Defendants committed numerous overt acts (each described in detail above). To highlight a few:

a.  **Routing Funds to Secret Account (Overt Act #1):** On or about May 2015, Showtime, through its officers, wired Mayweather's purse and pay-per-view upside from the Pacquiao fight into First Security Bank Account #... (Jeff Morris account) rather than to Mayweather. This was an act that furthered the conspiracy by putting the money within Haymon's easy reach.

b.  **Recording False Expenses (Overt Act #2):** Showtime's accounting statements for fights (at least those that have been seen) included inflated or false "expenses" which reduced Mayweather's net. For example, charging $50 million in vague expenses and $20 million for Berto on the Pacquiao ledger—acts which concealed the diversion of funds. If these entries were made at Haymon's request, Showtime's inclusion of them was an act joining the conspiracy (as it gives a paper justification to withhold money from Mayweather).

c.  **Misrepresentations and Concealment (Overt Act #3):** Espinoza (and by extension Showtime) made misrepresentations to Mayweather's team by omission—failing to disclose that, for instance, a big chunk of Pacquiao fight money was being held back (purportedly for "reimbursements"). And later, in 2024, claiming records were lost (a potentially false statement) was an overt act to keep the fraud hidden.

d.  **Stephen Espinoza's acceptance of a role with Haymon (Overt Act #4):** In late 2023, Espinoza's negotiation and agreement to work for Haymon's PBC, while not illegal itself, evidences the tight relationship. If (as Mayweather suspects) part of Espinoza's deal included not speaking out on the Mayweather money issue or continuing to shield Haymon, that agreement and Espinoza's silence are overt acts consolidating the conspiracy.

51.    The object of the conspiracy was unlawful—it encompassed fraud (the intentional misrepresentation and concealment of material facts regarding Mayweather's money) and

conversion (theft of his funds). The primary purpose was to cause injury to Mayweather while benefitting the conspirators. The conspirators must have had the intent to harm (or to benefit themselves knowing harm to another is substantially certain). Here, Haymon clearly intended to harm (financially) Mayweather by taking his money. Showtime/Espinoza may not have harbored personal ill-will toward Mayweather, but they acted intentionally to assist Haymon's ends (to benefit themselves or their company), knowing that the natural and necessary consequence was that Mayweather would be deprived of his rightful funds. That suffices for the "malice" element of conspiracy—an injurious act done without justification for the benefit of the conspirators at the expense of the plaintiff.

52.    As a direct and proximate result of the conspiracy, Mayweather suffered the aforementioned damages (loss of funds, etc.). In civil conspiracy, each conspirator is jointly liable for all acts of co-conspirators in furtherance of the plan. Therefore, Showtime and Espinoza are jointly liable for the entire damage amount, even for acts (like Haymon physically transferring money) that they did not personally carry out, because those acts were committed in furtherance of the agreed scheme.

53.    Showtime is vicariously liable for the acts of its employees/agents (like Espinoza and others) taken within the scope of their employment and in furtherance of corporate interests. The conspiracy involved actions by Showtime's officers (Espinoza) and possibly other staff in accounting, thus binding the corporation to the conspiracy.

54.    A conspiracy to defraud merits punitive damages as it involves deliberate concerted wrongdoing. The combination of a powerful manager and a major network to secretly divert a fighter's earnings is highly reprehensible. Mayweather seeks punitive damages here as well. The amount should be sufficient to punish each conspirator; in Showtime's case, given its financial size, the amount should be significant enough to be felt by a large corporation (subject to any statutory caps and constitutional limits).

**THIRD CAUSE OF ACTION**
**CONVERSION**
*(Against Showtime and Stephen Espinoza)*

55.     Plaintiff realleges each the foregoing paragraphs as if full set forth herein.

56.     Mayweather had ownership or immediate right to possession of the monies earned from his fights, including the portions paid by the networks after expenses. Once Mayweather performed in the fights and the revenue was generated, the contractually due amounts (purse, guaranteed amounts, percentage of PPV sales, etc.) belonged to Mayweather. These funds are personal property (money) in which Mayweather had a proprietary interest. Even if held temporarily by a third party (Showtime) for distribution, those specific funds were designated for Mayweather.

57.     Defendants exercised wrongful dominion and control over Mayweather's property, in a manner inconsistent with Mayweather's rights. Specifically, Showtime and Espinoza intentionally directed Mayweather's money to be deposited in an account that Mayweather did not control (thus denying him dominion over it). Thereafter, by following Haymon's directives rather than Mayweather's, they aided in wrongfully retaining those funds away from Mayweather. Conversion does not require a manual taking by the defendant; it suffices if the defendant played a role in wrongfully assuming control over the property or preventing the owner from accessing it. Here, when Showtime sent, say, $100 million of Mayweather's money to the First Security Bank account, and that money was subsequently paid out to Haymon or others without Mayweather's authorization, Showtime effectively asserted control in a manner adverse to Mayweather's rights. Espinoza, as the executive in charge, authorized or allowed these actions.

58.     The acts of dominion were intentional—it was no accident that the money went where it did. Defendants cannot claim good faith or mistake as a defense; conversion is actionable even if done without conscious wrongdoing, but in this case there was knowing complicity. The conversion is not excused by any contractual provision, because no contract allowed Showtime to pay Mayweather's share to someone else without Mayweather's informed consent. Any claim that "we were just following instructions from Mayweather's advisor" fails because those instructions

1   were not truly from Mayweather; and once Defendants knew or should have known of the breach

2   (as alleged), any continued control was clearly wrongful.

3       59.    Typically, if the defendant initially acquired the property lawfully, a demand and

4   refusal to return it can establish conversion. Here, to the extent Showtime initially lawfully held

5   Mayweather's money as a stakeholder, Mayweather's team (through Schaefer and attorneys) did

6   in late 2024 demand an accounting and effectively the return of funds wrongly withheld (like the

7   $20M Berto money). Showtime did not return any funds or provide the accounting, effectively

8   refusing. Moreover, now by filing this suit, Mayweather formally demands return of all his

9   converted property. Defendants have not returned it.

10      60.    The value of the property converted is at least $340 million (or an amount to be

11  proven at trial). Mayweather is entitled to recover this value from Defendants. Additionally,

12  consequential damages such as lost investment income or interest can be recovered. For instance,

13  if $100 million was converted in 2015, Mayweather should recover not just $100 million, but also

14  the reasonably foreseeable profits from that money over the years (or statutory prejudgment

15  interest as a proxy). These damages are directly attributable to the conversion—had Mayweather

16  had control of his money when due, he would have had it to invest or use.

17      61.    Showtime and Espinoza are jointly liable with each other, and also jointly liable as

18  co-conspirators or aiders with Haymon for conversion. Even if Espinoza did not personally

19  transfer funds, he is liable if he directed or ratified the acts. Showtime is liable through respondeat

20  superior for Espinoza's acts. Each defendant who participated in the conversion is responsible for

21  the full amount.

22      62.    Conversion, when accomplished willfully and with oppression or fraud, can justify

23  punitive damages. Here, taking someone's money in secret is essentially theft with fraud.

24  Defendants acted in conscious disregard of Mayweather's ownership rights. Punitive damages are

25  thus warranted to the extent not duplicative. Mayweather seeks punitive damages for conversion

26  as an alternate theory as well.

27

28

### FOURTH CAUSE OF ACTION
### UNJUST ENRICHMENT
*(Against Showtime and Stephen Espinoza)*
*Pled in the alternative, to the extent a contract or tort claim does not provide full relief. If any funds cannot be recovered under other counts, they should be recoverable in equity.*

63.     Plaintiff realleges each the foregoing paragraphs as if full set forth herein.

64.     Showtime and Espinoza (and/or their employer) received benefits at Mayweather's expense. These benefits include: (a) Use of Mayweather's Money: By holding Mayweather's funds for extended periods, Showtime had the use of that money (interest, float, or investment benefit). For example, if tens of millions sat in accounts under Showtime's or Paramount's control for months or years (even if later disbursed wrongly), Showtime benefited from that liquidity. (b) Revenues and Business Goodwill: Showtime benefited enormously from Mayweather's fights—they gained subscribers, ratings, and profits. While they paid Mayweather some of what was due, by not paying the full amounts or by deducting improper expenses, they kept extra profit. (c) Avoided Liabilities: By not paying the $20M from Pacquiao fight to Mayweather (under pretense of Berto reimbursement), Showtime/Paramount saved itself that money. If Showtime was supposed to cover Berto's guarantee but instead took it out of Floyd's cut, Showtime was unjustly enriched by $20M. (d) Espinoza's Personal Benefit: Espinoza's career benefited from placating Haymon—he landed a new lucrative consulting role. To the extent that came at the cost of Mayweather's rights, Espinoza profited by the situation.

65.     Defendants appreciated and knew of the benefits. They certainly were aware of the money they held and where it went. Showtime was aware that having Mayweather underpaid (via Haymon's machinations) left more money on the table that ended up with someone other than Mayweather, which in part benefited Showtime or its partners. Espinoza appreciated that keeping Haymon satisfied (even if Mayweather was being shorted) benefited him professionally. Internal communications likely show that Defendants were pleased with how arrangements were working (Showtime saved money on certain payouts, etc.).

66.     It is inequitable for Defendants to retain these benefits without paying fair compensation to Mayweather. Unjust enrichment occurs when one has and retains money or

benefits which in justice and good conscience belong to another. Here, any extra profits Showtime made by underpaying Mayweather *belong to Mayweather in equity*. Any business advantage gained by Espinoza by betraying Mayweather's interests is not one he should be allowed to keep (though intangible, it can be a basis for disgorgement or at least considered in punitive damages). To illustrate, suppose Showtime internally allocated some of Mayweather's unpaid $50M as "savings" or reallocated to other projects—that $50M rightfully is Floyd's and equity compels its return. The standard is whether Defendants' retention of the benefit would be unjust. Given that the benefits were derived from fraudulent or unauthorized acts, it is manifestly unjust for Defendants to keep them.

67.    Mayweather pleads this count in the alternative. If for some reason a technical issue precludes recovery in contract or tort (for example, if Defendants argue they had no direct contract with Mayweather for those specific funds, or if tort claims were limited), then unjust enrichment should fill the gap. There was no valid, enforceable contract that authorized the retention of these benefits by Defendants (any argument to the contrary would itself rely on void or unenforceable arrangements tainted by illegality). Therefore, quasi-contract applies to prevent Defendants' unjust enrichment.

68.    The amount of restitution due from Defendants is to be determined at trial, but includes at least: the value of all Mayweather fight proceeds improperly withheld by Showtime (including interest or earnings thereon) and any other gains unjustly obtained. This could be coextensive with the damages in other counts ($340M+). Unjust enrichment allows for recovery of "the benefit conferred" or the "reasonable value" of what was taken. Here, the benefit was money, so its face value plus interest is appropriate.

69.    Both Showtime and Espinoza can be liable for unjust enrichment. Showtime directly held the funds, and Espinoza, if found to have personally benefited or to have been the moving force, can be asked to make restitution as well (particularly if any of the enrichment was personal).

70.    In aid of this claim, Mayweather seeks the imposition of a constructive trust over any funds or assets traceable to his misappropriated earnings. This includes any bank accounts at

Showtime or Paramount that still hold Mayweather-related monies, any funds paid to Haymon that can be traced (Showtime should be compelled to help trace them), and even potentially Espinoza's compensation from Haymon if it is seen as a quid pro quo for past cooperation (that portion could be disgorged in equity to prevent unjust enrichment). The constructive trust is appropriate because the money rightfully belongs to Mayweather and equity treats that money as if held in trust for him.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Floyd Mayweather, Jr. prays for judgment in his favor and against Defendants as follows:

  i. An award of compensatory damages in an amount to be proven at trial, but presently estimated to exceed $340,000,000, representing the misappropriated funds and all other financial losses proximately caused by Defendants' conduct. This includes but is not limited to: the principal amount of money diverted, lost investment profits or interest, and out-of-pocket costs for investigation and litigation;

  ii. In addition, or in the alternative, an order requiring Defendants to disgorge all benefits unjustly obtained from the conduct, and to make restitution to Mayweather of all funds by which they were unjustly enriched;

  iii. An award of punitive and exemplary damages against each Defendant, in an amount sufficient to punish their willful, malicious, and fraudulent behavior and to deter such conduct in the future. Given the scope of the wrongdoing, Plaintiff suggests a punitive award at least equal to the compensatory damages (or as allowed by law and the evidence) against each Defendant;

  iv. Preliminary and permanent injunctions as necessary to prevent further dissipation of funds and to aid in recovery. This may include enjoining Defendants from transferring any disputed funds, and compelling an accounting. Also, an injunction requiring full disclosure of all financial

1        records related to Mayweather's fights and directing Defendants to

2        cooperate in recovering money from Haymon and related entities;

3      v.    Imposition of a constructive trust over all funds or assets in Defendants'

4        possession (or control) which are traceable to Mayweather's earnings,

5        including any funds currently held that belong to Mayweather (such as the

6        $20 million Berto money, if still held or owing), and any other property

7        acquired with misappropriated funds;

8     vi.    An award of Plaintiff's reasonable attorneys' fees, accountants' fees, and

9        costs of suit, to the extent permitted by law;

10    vii.   An award of pre-judgment interest at the maximum rate allowed by law on

11       all liquidated or ascertainable sums, from the date of loss to the date of

12       judgment, and post-judgment interest thereafter until paid, so as to fully

13       compensate Plaintiff; and

14   viii.   Such other and further relief as the Court deems just and proper. Given the

15       egregious nature of the conduct, Plaintiff specifically requests the Court's

16       consideration of any additional remedies appropriate in equity or law to

17       achieve justice.

18

19                    **JURY TRIAL DEMAND**

20    Plaintiff Floyd Mayweather, Jr. hereby demands a trial by jury.

21

22  Dated: February 3, 2026            **SAMINI BLOCK APC**

23

24           By:  _____

25                Bobby Samini

                     Attorney for Plaintiff

26                FLOYD J. MAYWEATHER

27

28